**E. Ray PRICE, d/b/a Ray Price Insurance Agency, Plaintiff in Error,**

**v.**

**GUARANTY NATIONAL INSURANCE COMPANY, a corporation, Defendant in Error.**

**No. 41945.**

Supreme Court of Oklahoma.

June 17, 1969.

Ames, Daugherty, Bynum, Black, Asha-branner & Rogers, Oklahoma City, for plaintiff in error.

Ben L. Burdick, Jack R. Durland, Jr., Crowe, Boxley, Dunlevy, Thweatt, Swinford & Johnson, Oklahoma City, for defendant in error.

LAVENDER, Justice:

This appeal involves the construction of an agreement in writing between Guaranty National Insurance Company, a corporation, and E. Ray Price, doing business as E. Ray Price Insurance Agency, whereby the latter agreed to act as the agent for the former in the sale of insurance within the State of Oklahoma. The petition filed by Guaranty alleged that Price owed Guaranty $5,062.23, which amount represented insurance premiums collected by Price on sale of Guaranty policies but which was not remitted to Guaranty. The agreement was dated May 21, 1962, and apparently was terminated at the end of December, 1963. Price denied a portion of the claimed indebtedness and claimed an offset for additional commissions which he said he was entitled to receive by reason of the agreement and an addendum thereto. Price further claimed an offset for certain items which were allowed by the trial court and are not involved in the matter now before us. The trial court awarded judgment in favor of plaintiff for the amount sued for together with an attorney fee, as authorized by the contract. The claims of Price to additional commissions and that a portion of the debt was improperly computed and therefore not valid were rejected by the trial court. Price's motion for new trial, which was upon the grounds generally that the trial court erred in its interpretation of the agency agreement, also alleged the existence of certain newly discovered evidence. The motion was denied and Price has appealed to this court.

The parties will be referred to by name or by their respective trial court designations.

Price's first proposition for reversal involves a determination by the trial court that Price was indebted to Guaranty for the sum of $833.90, which sum represented a charge by the insurance company against Price for the difference between what Price computed the "earned" premium due Guaranty on seven policies of liability insurance, identified as "Owners-Landlords-Tenants" policies, and the amount which the company claimed should have been remitted to it. The policies in question are identical and the reference to one of them at the trial was agreed by the parties to be equally effective as to each policy. One of these policies, identified as "The Fair Park Policy, No. OLT 006410," was admitted into evidence and provides for coverage, to the named insured, from March 16, 1963, to March 16, 1964, and covered the insured's operations on the premises described, insuring against claims for personal injury and/or property damages. The premium for that coverage was $53.94 an-

nually. Attached to the policy was an endorsement providing similar coverage on the premises for the operation of "Competition and Rental Kart Tracks," the premium for which was $417.48, and the exposure period provided was from March 16, 1963, to September 16, 1963. The endorsement also provided that in the event of cancellation of the coverage by the company the latter would be entitled to retain, as earned, a pro rata portion of the premium charged. When the company cancelled the policies, together with the endorsements, Mr. Price computed the earned premium pro rata but as if the premium charged was for one coverage and for the same insured period, that is, from March 16, 1963, to March 16, 1964. The company, when it received Mr. Price's statement upon which his method of computing the earned premium was shown, did not at that time object to the method used. The company did object when some nine months later it refigured the account and discovered what it characterized as an error on Mr. Price's part. It was at that time that the company began billing Mr. Price for the additional charges.

Price contended, both before the trial court as well as in his brief filed here, that the company "approved" his method of calculating the charges. As we understand Price's contentions regarding these seven policies, he takes the view that the policy and its endorsement of additional coverage constitute one policy of insurance. He agrees, however, that the provisions of the policies are "clear and unambiguous." The insurance company, on the other hand, argues that the coverages afforded by the policies are separate and distinct. That the Kart Track coverage was designed to afford protection on a seasonal basis during the operation of the particular hazard insured against and the pro rata computations of the earned premiums for this coverage should be upon the shorter period of hazard, and the computations upon the broader hazard of general operations should be based upon the full annual term. As we see it, two separate premiums, relat-

ing to the hazards in operating two different businesses for two separate and distinct coverage periods, were involved so that, as a practical matter (especially in view of the definitions of the terms "earned premium" and "unearned premium," set forth and adopted in our consideration of the defendant's second proposition), it would be necessary to pro rate such premiums separately in refunding any unearned portions thereof to the insured.

■ We are of the opinion that the language of the policies and the endorsements is clear and unambiguous and reasonably supports the interpretation placed thereon by the trial court's judgment for the company on this issue. Johnson v. O-Kay Turkeys, Inc. (1964), Okl., 392 P.2d 741.

The defendant Price's second proposition involves the refusal of the trial court to recognize Price's claim that he was entitled to additional commissions from Guaranty. Price's claim is based on certain provisions of the agreement which in effect provided that Price would be entitled to receive additional commissions which would be computed by reference to the loss ratio of the business written by Price during annual periods of the agreement. The following provision appears, however, as a part of the addendum:

> "A condition precedent to entitle the General Agent (Price) to the additional audit commissions provided in this Addendum shall be that the General Agent will develop a minimum earned premium during the first 12 months of this Contract of $50,000 dollars and thereafter a minimum annual earned premium of $100,000 dollars."

Price's second proposition is determinable by answering the question of whether to "develop a minimum earned premium" meant that Price had only to produce more than $50,000.00 worth of written premiums during the first twelve months of the agency's operations (a meaning contended for by Price), or whether it meant that the written premiums (the premium specified in the policy) would be reduced by deduct-

ing therefrom the "unearned" portions of the premiums and that it was only if this remainder (earned premiums) exceeded the $50,000.00 figure that Price would be entitled to his additional commissions.

As we understand Price's contention in connection with the above-quoted proviso, he urges that the use of the word "develop" means "to promote" or "to produce" and that its use indicates an intent that he only had to sell insurance policies upon which the "written premium," as distinguished from the "earned premium," would exceed $50,000.00. No authorities are cited to support Price's contention that written premiums mean the same thing as earned premiums. He argues, however, that written premiums are the same thing as "developed" premiums. He would seem to ignore the use of the word "earned" in the proviso to the addendum.

Guaranty asserts that "earned" premium has a very definite and well understood meaning in the insurance business. Our attention is called to 44 C.J.S. Insurance § 340 page 1303 wherein appears the following statement:

> "*Earned and unearned premium.* An 'earned premium' has been defined as the difference between the premium paid by insured and the portion returnable to him by the insurance company on cancellation of the policy during its term. The 'unearned premium' is that portion of the premium paid by insured which is returnable to him on cancellation of the policy during its term."

To the same effect, see Aetna Ins. Co. et al. v. Travis (1926) 121 Kan. 802, 257 P. 337 and Cavanaugh et al. v. Fireman's Fund Ins. Co., U.S.D.C., Nebraska, 1951, 99 F.Supp. 1001, affirmed, C.A. 8th Cir., 1952, 197 F.2d 853.

In Aetna Ins. Co. et al., supra, the Kansas court gave this example:

> "* * *, if a policy written for the term of a year, on which the premium is $48, is canceled after being in force one month, $4 would be retained by the company as earned premium and $44 returned to the insured as unearned premium. If canceled when the policy had been in force ten months, the company would retain $40 as earned premium and return to the insured $8 as unearned premium. So the question of the amount of the earned premium and of the unearned premium, respectively, upon the policy, is determined as of the date of its computation rather than over any given period of time. * * *."

The above is supported by the testimony of the only witness who testified in this matter regarding the use in the insurance business and the meaning attributable by those engaged in that business to the terms "earned" and "unearned" premiums. In Cavanaugh v. Fireman's Fund Ins. Co., supra, 99 F.Supp. at page 1008, the author of that opinion, the reasoning of which was approved by the Court of Appeals, pointed out that the plaintiff there contended that his contingent commissions were to be figured on the net premiums written. The court said:

> "* * *. This position is obviously in conflict with the express provisions of the formula which requires the inclusion of only the net *earned* premiums of the year for which the computation is being made. To accept plaintiffs' position the Court would have to strike from the contract, or at least disregard, the term 'earned' which modifies the noun 'premiums'. This, the Court has no authority to do."

We agree that here also we have no authority to disregard the clearly expressed agreement of the parties. Price's contention that the additional word "develop" lends a different meaning to the term "earned" is not impressive.

Applying the above definitions of the terms "earned" and "unearned" premiums to the evidence in this matter, we find that it fairly establishes that for the first twelve months of Mr. Price's sales he was able to develop "written premiums" of more than $50,000.00; however, he was only able to develop "earned" premiums of

about $21,632.95. There was some evidence that this figure was perhaps not precisely correct; however, there was no testimony that earned premiums were produced by Price in excess of $38,921.13.

Defendant, in his reply brief, points out that if the company had not cancelled the insurance policies sold by the Price agency prior to the expiration of the first twelve months of the agency agreement, the "earned" premiums on the policies would have exceeded the $50,000.00 figure. We know of no limitation upon the right of the company to cancel the policies. No provision in the agency agreement provides for computation of "earned" premiums upon a basis favorable to the agent if the policies are cancelled by the company and upon a different basis if they are cancelled by the insured. No allegation of bad faith on the part of the company appears in the pleadings. No reasons are assigned as to why the company cancelled the policies and it seems rather strained to assign, as the reason, the avoidance of payment of commissions to the agent who sold them. Such contention is without substance.

We hold there was no error in the trial court's judgment to the effect that it was the intent of the parties to the agency agreement that Price would only be entitled to receive the additional commissions provided for in the addendum to that agreement if he produced, during the first twelve months of his operations, earned premiums, as that term is hereinabove defined, in excess of $50,000.00.

■ The third and final proposition of Mr. Price upon which he asks us to reverse the ruling of the trial court involves that court's order overruling Price's motion for new trial upon the ground of newly discovered evidence. The evidence in question concerned that of two former employees of Guaranty who would—Mr. Price contended in an affidavit attached to his motion for new trial—testify that when the company received Price's statement concerning the amount of earned premium on the seven Go Kart Track policies, it then audited the statement and approved it as submitted. In other words, such testimony would, if considered, contradict that of Mr. Balogh, the single witness who testified for Guaranty to the effect that the company did not audit the statement of Mr. Price when it was first received (September, 1963) but relied on Price's statement as correct until when in May, 1964, it recomputed the matter and then determined that Price had mistakenly figured it, to the extent of $833.90 additional premiums due from Mr. Price to Guaranty.

■ This evidence, discovered by Mr. Price after the trial of the cause, would, we think, be merely cumulative and contradictory. It would, of course, tend to impeach Mr. Balogh's testimony on the point. We do not think it would have changed the result of the trial, at least it has not been sufficiently shown to our satisfaction that the trial court abused its discretion in denying the motion for new trial. In Johnston v. Woodard (1962), Okl., 376 P.2d 602, we said in paragraph 3 of the syllabus:

"In order to entitle a party to a new trial on the ground of newly discovered evidence, among other things, the evidence relied upon must not be merely cumulative or contradictory to the former evidence but it must be such as will probably change the result in the event a new trial is granted."

To the effect that the action of the trial court in denying a motion for new trial on newly discovered evidence will not be reversed by this court in the absence of a showing that the court abused its discretion, see O'Hern v. Hatter (1941), 189 Okl. 663, 119 P.2d 48.

The judgment of the trial court is affirmed.

All the Justices concur.